## The Krona.[1]

Fry and another *v.* The Krona.   (Riley and others, Intervenors.)

*(Circuit Court, E. D. Texas.  1886.)*

**Salvage—Breach of Contract by Vessel.**

A vessel, by breach of her contract with another vessel, having contributed to put the latter vessel in danger and peril, cannot and ought not to be compensated for services, although otherwise salvage services rendered in aiding to rescue her.

Admiralty Appeal.
*Wheeler & Rhodes,* for libelants.
*Ballinger, Mott & Terry,* for intervenors.
*Waul & Walker,* for claimants.

Pardee, J.  On January 2, 1885, libelants' tug Continental, under contract, undertook to tow the bark Krona from the wharf at Galveston outside and over the bar, preparatory to completing the latter's cargo for the voyage.   After towing her out into the harbor to Bolivar roads, inside the bar, and although there was plenty of time and tide, the tug cast off the hawser of the bark, and left her there, with directions to anchor, while the tug went off to tow another ship over the bar, the Kong Sevier, which it is alleged was first at the bar, and, according to custom, first entitled to go to sea.   After towing over the Kong Sevier there was no time to take out the Krona, nor any offer or effort to do so.   The Krona anchored in Bolivar roads, with the starboard anchor in about five fathoms of water, and remained there that night, and until the fifteenth of January, because during that period the weather and state of water on Galveston bar was such that she could not be towed out, and during all this time she rode with but the starboard anchor.

On the night of the 15th, while the master and crew were below, and the watch, if any, negligent, she dragged her anchor over a mile, and went ashore, in some unaccountable way, head on.   Some time after she struck, and before she settled in the sand, the port anchor was let go.   On the morning of the 16th, with a strong northwest wind, (28 miles per hour,) and the mercury below freezing point, the Krona, then drawing 13 feet forward, and 13 feet 5 inches aft, was aground in about 10 feet of water, and with 2 feet of sand all around

----

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

her, on the south-east shore of Galveston harbor, near the end of the south jetty, about four miles from the quarantine station, headed S. E., with a starboard anchor out, with 45 fathoms of chain abreast and astern, at an angle of 45 deg., with the side of the ship and the port anchor out, with about 5 fathoms of chain, the same running over to starboard, and perhaps under the ship's forefoot, and she was flying a hybrid signal, which was susceptible of being taken either as a signal for a pilot, or as a signal of distress.

The tug Continental, drawing eight and a half feet, and lying at Galveston wharf, took it for the latter, and steamed down to offer assistance. On coming near the Krona she thumped and bumped so, according to the master's evidence, that she could do nothing but communicate with the Krona by hallooing, and then she steamed back to the wharf for a yawl-boat. At the wharf she took libelant Heffron and three men, and, with a 20-foot yawl, went back to the Krona. Heffron and three men got aboard by using the yawl, and then, by consent of the master and the aid of the Continental, run out a kedge-anchor about 80 fathoms astern of the Krona, to hold her from going further ashore, or over onto her port anchor. The chain to this anchor led to the starboard quarter of the Krona. Following this, Heffron got out a hawser from the port quarter of the Krona to the Continental, and the Continental tried to pull the bark astern, while the crew of the Krona, by means of a luff tackle and the ship's capstan, hove in on the kedge-anchor.

There is a dispute, under the evidence, as to whether this resulted in pulling the ship astern through the quicksand. Heffron says it did about 25 feet, and that, by such moving astern, he was able to get up the port anchor, which was endangering the ship. Anyhow, the port anchor was taken in; and, whether the chain attached to this anchor run under the forefoot or not, it was well to have it in, as the ship seemed to have the dangerous faculty of dragging her anchors, and drifting head on, though carrying no sail. This service of the Continental and Heffron ended the day's work in the way of salvage, and the Continental returned to her wharf.

The evidence shows that for the latitude the weather was extremely cold; and the services rendered were accompanied with this hardship. One man, James Willett, shows that his feet were frost-bitten.

The Krona remained over night of the 16th substantially as left by the Continental, though the master of the Krona says the wind fell off, and that the kedge-anchor put out astern was of no use to hold the ship in position, and the hawser had to be slackened, as the ship was rolling a little. On the morning of the 17th, the wind had moderated, shifting to the north, and the water was smoother. About half past 7, Heffron went aboard the Krona from the Continental, which passed along, towing the lighter Reliable outside. Soon after, the steam-lighter Buckthorne, bringing a pilot, came along-side, and made fast on the starboard side. The master of the Krona, declin-

ing all offers of assistance until he could have a contract, took a pilot-boat, and, from that, the tug Estelle, about 8:30 A. M., to go to town, leaving the mate in charge, with instructions not to allow any one to touch ship or cargo until he came back. The morning was passed aboard the Krona in talking and waiting. About noon the Continental arrived, and made fast to the Buckthorne. The flood-tide commenced running about the same hour. As the tide rose the chances of getting the ship off improved, and the officers and men of the Buckthorne and Continental importuned the mate to give them leave to pull the ship off. The mate refused, because of the captain's orders, and then Pilot Dronet assumed command, and, under his directions, in about one hour and a half, the Buckthorne and Continental succeeded in getting the Krona off, and into deep water. In the mean time the master of the Krona had made a bargain with the owners or agents of the Buckthorne to take the Krona off; if it could be done without lightering, for $250; and, if lightering should be required, an additional charge of $2 per ton for lightered cargo.

The Krona was apparently uninjured; but in fact her tiller was broken off close to the rudder head, the false keel was partly torn away, and the copper was also partly torn off. The ship and cargo of oil-cake were worth $14,000. The Continental suffered some injury from the thumping received on the 16th. Her steam-pipe was sprung, and the joint started so that steam leaked, and the condenser pipe was broken loose, causing a water leak. The owner, Heffron, swears to an estimate of this damage at $450, and to the value of the tug at $15,000.

Fry & Heffron, owners of the Continental, libeled the Krona on behalf of themselves and the crew, demanding compensation for salvage services. In their libel they exaggerate the services of the Continental and crew, and also the danger and peril of the Krona, and say nothing of the towage contract, nor how the Krona came to be "in Bolivar roads, then waiting to be towed outside," and they are equally silent as to the assistance rendered by the Buckthorne.

Irvine & Beissner, owners of the lighter Buckthorne and the Estelle, also libel the Krona for salvage. They claim $2,500 for the Buckthorne and $25 for the Estelle; the latter for carrying the master of the Krona to town. In their libel they exaggerate the danger and peril of the Krona; magnify the services of the Buckthorne; barely admit that the Continental was there, but insist that she rendered no services; and are silent as to the now admitted contract to take the Krona off for $250, and $2 per ton for lighterage.

John Fry, master, Pat Riley, engineer, John Riley, fireman, George Nelson and Tom Green, seamen, of the crew of the Continental, and James Willett, Joe Robinson, and Thomas Brown, seamen and volunteers, intervene in the case, and, alleging their services on board the Continental, reiterate and indorse the averments in the libel of Fry & Heffron, owners, and ask compensation.

I have read the voluminous evidence in the record, and have carefully considered it. The position of the Krona on the morning of January 16, 1885, was undoubtedly one of danger and peril. She was helpless, so far as her own resources were concerned, and, in the most disagreeable and boisterous month in the year in Galveston bay, was entirely dependent upon outside help or moderate weather for safety. It is true that, wind and weather permitting, she might have lightered cargo, and then in time have been worked off with her own crew and appliances. But at that time and place no prudent master would have been justified in taking the risk to both ship and cargo.

The services rendered by the Continental and her crew, with Heffron and the volunteers, on the 16th, in running a stern anchor, and in getting in the port anchor, were valuable services, and, it would seem, secured the Krona from working further ashore, and diminished the risk of her riding her own anchor. In the rendition of these services, the crew of the Krona undoubtedly aided; but I think it clear that they could not, unaided, have got out the stern anchor. In the light of the evidence the services were successful and useful.

The services rendered on the next day (the 17th) by the Buckthorne and the Continental were undoubtedly beneficial and successful in relieving the Krona and her cargo from their perilous position, and I conclude they are entitled to rank as salvage services of a low grade. The services rendered were in the usual line of service of both tugs, and were not accompanied with risk or peril; in fact, the owners of the Buckthorne had contracted, as in their usual line, to render the service. But it must be remembered that the Krona was a sailing vessel only, two feet in the sand, head on, wind astern, master ashore, mate incompetent, and that these services were largely the continuance of the services of the previous day. Pilot Dronet, however, who has been mentioned herein, seems to me to be as much entitled to credit as either of the tugs.

The allowance of salvage to the Continental and her owners is strenuously resisted on the ground that it was through the violation of the towing contract, and the bad faith of the master and owners of the Continental, that the Krona was placed in peril. Under the evidence, it seems clear that the master of the Continental had contracted to tow the Krona outside; that he entered upon the towage, towed the vessel down to Bolivar roads, and there left her; that he could have carried out his contract, but chose to abandon the Krona, to take out another ship to which he thought he ought to give preference under an alleged custom. It is not denied that Heffron, one of the owners of the Continental, told the master of the Krona that his should be the first vessel taken out, and Pilot Luth says that the master told him so in the presence of Heffron & Fry, and there is no pretense that either told the master that there was another ship to go out first. The alleged custom to take across the bar the first vessel arriving in the roads is not proved; the evidence is against it.

Nor is it shown that the master of the Krona consented to be left in the roads; nor that the pilot, Luth, ordered that the Krona should be left in the roads. The fact is, under the evidence, that the Continental undertook more business that day than she could do, and it therefore suited her purposes to break her contract with the Krona, and leave her in the roads until a more convenient season. This breach of contract contributed, with the incapacity or overconfidence and negligence of the officers and crew of the Krona, to send her ashore, beyond her own power to help herself off. The Continental having, by her breach of contract, contributed to place the Krona in danger and peril, cannot and ought not to be compensated for services, albeit otherwise salvage services, in aiding to rescue her.

The contract made with the owners of the Buckthorne for the services rendered by her in relieving the Krona was fair and reasonable, and without fraud or mistake, and was therefore a binding contract. See *The Delambre,* 9 Fed. Rep. 775.

The evidence shows that James Willett, one of the volunteers, had his feet frost-bitten, and that circumstance should give him an extra allowance as salvage. See *The Cyclone,* 16 Fed. Rep. 486. The district judge allowed him $100. This amount, under the circumstances of the case, is rather liberal; but, as it is on a basis of $50 to each volunteer, (which basis, and allowances thereunder, this court, on this appeal, cannot reduce,) I am indisposed to reduce it.

The claimant only has appealed from the judgment of the district court, and, as the allowances for salvage were not made in a bulk sum, to be distributed, but were made on the individual libels, in a specific sum to each libelant, I have doubt as to whether there is any appeal from the judgments in favor of Capt. Fry, master of the Continental, $25; Isaac Heffron, $50; Joseph Robinson, $50; Thomas Brown, $50; Pat Riley, $25; John Riley, $25; George Nelson, $25; and Thomas Green, $25. The gross amount of these judgments is $275, but no one of them, by itself, is for an appealable amount.

Ordinarily, in adjudging salvage compensation, the claimants are required to pay costs. I make an exception in this case, because one libel is dismissed entirely, and in another the amount allowed by the district court is reduced, but principally because in both the libels of Fry & Heffron and of Irvine & Beissner facts material to their cases, and fully within their knowledge, and most essential for the court to know, were suppressed. *Suppressio veri, suggestio falsi.*